UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**THEODORE SCHREIBER, M.D**.,
*an individual,*

          Plaintiff,                                    Case No.:  19-cv-

v.                                                              Hon.

**TENET HEALTHCARE CORPORATION**,
*a foreign for-profit corporation*,  **VHS, INC.,** *a*
*foreign for-profit corporation,* **VHS OF MICHIGAN,**
**INC**, *a foreign for-profit corporation,* d/b/a Detroit
Medical Center ("DMC")*,* **VHS HARPER-HUTZEL**
**HOSPITAL, INC.**, *a foreign for-profit corporation*,
**VHS SINAI-GRACE HOSPITAL, INC.**, *a foreign*
*for-profit corporation,* **VHS DETROIT RECEIVING**
**HOSPITAL, INC.**, *a foreign for-profit corporation*, jointly
 and severally, (Collectively DMC and/or TENET), and **DR.**
**ANTHONY TEDESCHI**, President of  VHS OF MICHIGAN
and CEO  of DMC, *an individual*, **SCOTT STEINER**, CEO of
HARPER  UNIVERSITY HOSPITAL, DETROIT RECEIVING,
AND HUTZEL HOSPITAL, *an individual*, and **ERIC EVANS**,
PRESIDENT OF TENET HOSPITAL OPERATIONS, *an individual*,

          Defendants.

---

DAVID M. OTTENWESS (P38820)
STEPHANIE P. OTTENWESS (P51426)
SARAH E. CHERRY (P78311)
Attorneys for Plaintiff
535 Griswold Street, Suite 850
Detroit, MI  48226
(313) 965-2121
dottenwess@ottenwesslaw.com
scherry@ottenwesslaw.com

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

1

Plaintiff, THEODORE SCHREIBER, M.D., states as follows for his Complaint against Defendants:

## JURISDICTION AND PARTIES

1.      Plaintiff, Theodore Schreiber, M.D. ("Dr. Schreiber"), is a board certified interventional cardiologist who was employed by the Detroit Medical Center in Wayne County, Michigan.

2.      Defendant TENET HEALTHCARE CORPORATION, INC., (hereinafter "Tenet") is a foreign for-profit corporation, incorporated in Nevada and headquartered in Dallas, Texas.  It is a multi-national, investor-owned healthcare services company.  As of December 2018, Tenet operated 68 hospitals. Tenet does business, and has numerous subsidiaries it operates and controls, in the State of Michigan.

3.      VHS, INC. is a foreign for-profit corporation, incorporated in Delaware and headquartered in Nashville, Tennessee.  In 2013, Tenet purchased VHS, Inc.

4.      VHS OF MICHIGAN, INC., a wholly-owned subsidiary of VHS, Inc., is a foreign for-profit corporation, incorporated in Delaware and doing business in Detroit, Michigan as The Detroit Medical Center ("DMC"), a Michigan corporation with its principal place of business in Wayne County Michigan.  In 2013, Tenet purchased VHS of Michigan through its purchase of VHS, Inc.

2

5.      VHS HARPER-HUTZEL HOSPITAL, INC., is a foreign for-profit corporation, incorporated in Delaware, is part of the DMC, doing business in Michigan as Harper-Hutzel Hospital (comprising Harper University Hospital, Hutzel Women's Hospital, the CardioVascular Institute and DMC Surgery Hospital).   In 2013, VHS HARPER-HUTZEL HOSPITAL, INC. became a subsidiary owned by Tenet.

6.      VHS SINAI-GRACE HOSPITAL, INC. is a foreign for-profit corporation, incorporated in Delaware, is part of the DMC, doing business in Michigan under different names, including Sinai-Grace Hospital and DMC.   In 2013, VHS SINAI-GRACE HOSPITAL became a subsidiary owned by Tenet.

7.      VHS DETROIT RECEIVING HOSPITAL, INC. is a foreign for-profit corporation, incorporated in Delaware, is part of the DMC, doing business in Michigan under different names, including among others as the Detroit Receiving Hospital, University Health Care and DMC. In 2013, VHS DETROIT RECEIVING HOSPITAL, INC. became a subsidiary owned by Tenet.

8.      Defendant Anthony Tedeschi (hereinafter "Tedeschi") is a licensed Medical Doctor. Tedeschi has been the Chief Executive Officer ("CEO") of the DMC since January 2017.  Tedeschi previously served as the CEO of the Chicago Market of Tenet.  He is a resident of the State of Michigan.

9.     Defendant Scott Steiner (hereinafter "Steiner") was the CEO of the adult DMC hospitals beginning in 2012.   He was asked to resign from Tenet and the DMC effective February 8, 2019. He is a resident of the State of Michigan.

10.     Defendant Eric Evans (hereinafter "Evans") was the President of Hospital Operations for Tenet from approximately March 2016 to December 2018. He was previously the CEO of the Texas Region for Tenet from approximately April 2015 to March 2016.  He is a resident of the State of Texas.

11.     The Court has subject-matter jurisdiction in this action pursuant to 28 U.S.C. §§1331 and 2601 *et. seq*., and 29 U.S.C. §794(a) because the Complaint states a claim that arises under the laws of the United States. This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 USC §1367 because these claims are so related to the federal claims in this case that they form part of the same case or controversy.

12.     Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. §1391(b), as it is in the district in which Defendants conduct business.

## BACKGROUND FACTS

### DR. SCHREIBER TURNS THE DMC INTO ONE OF THE LEADING HEART HOSPITALS IN THE UNITED STATES

13.     Dr. Schreiber is a world-renowned interventional cardiologist.

14.     Dr. Schreiber is considered a pioneer in complex treatments for higher-risk cardiology patients.

4

15.     In 2004, Dr. Schreiber was recruited and eventually hired by then-DMC CEO Mike Duggan, now Mayor of Detroit, to build a cardiovascular program at the DMC.

16.     Dr. Schreiber was employed by the DMC in the positions of President of the DMC Cardiovascular Institute and Specialist-In-Chief, Cardiovascular Medicine, Detroit Medical Center.

17.     Before Dr. Schreiber became President of the DMC Cardiovascular Institute, the DMC cardiovascular program was in complete disarray, deficient in meeting national minimal standards, barely providing mediocre service to the inner-city residents of Detroit.

18.     Dr. Schreiber quickly instituted quality controls, increased staffing and began recruiting private cardiologists to boost quality of care and patient volume.

19.     Dr. Schreiber and DMC achieved great success, improving outcomes and increasing the patient base.

20.     In addition, Dr. Schreiber developed a new treatment approach designed to significantly lower mortality rates among patients presenting to the emergency department who have experienced heart attacks.

21.     Improvement in the treatment of heart attacks was vitally important in Wayne County and the City of Detroit in particular where deaths due to heart disease occurred at a significantly higher rate than surrounding areas.

22.     Heart attacks are caused by a blocked artery that feeds the heart, abruptly shutting down.

23.     In order to lower the risk of death, save precious heart muscle and improve long term functional outcome, this artery must be opened up immediately; typically with emergency balloon angioplasty and stenting.

24.     Dr. Schreiber's new treatment approach focused on improving the ability to treat these arteries "immediately."

25.     This concept eventually became known as Cardio Team One™ ("CTO").

26.     CTO began operating in March 2008 with Dr. Schreiber as its Director.

27.     CTO was built on the foundation that since the time frame from heart attack onset to the patient's emergency department ("ER") presentation cannot be easily controlled, the focus must be on minimizing the time frame from the point the patient enters the ER door to balloon angioplasty time, known as the "door-to-balloon time".

6

28.    This would be accomplished by eliminating factors which create delays in treating these emergency patients including inexperience of providers, team unavailability and facility unavailability.

29.    Specifically, a team and program were created consisting of a senior highly qualified Interventional Cardiologist; a highly qualified Catheterization Team: cardiovascular catheterization RN, senior CVT and a radiology technician; together with a fully functional, full service perpetually ready interventional cardiac catheterization laboratory.

30.    These highly qualified teams, and perpetually ready laboratory, would be available – on site (not on call) – 24 hours per day/7 days per week/365 days per year.

31.    Being on site was imperative for this program to work, especially given the factors unique to the DMC, including its inner-city location, and the difficulties in achieving rapid arrival of interventional physicians and support staff from largely suburban residences, particularly during off hours and in poor weather.

32.    CTO is one of the nation's only cardiology teams that staffs its cardiac catheter lab night and day.

33.     With the changes implemented at DMC, in addition to the creation of CTO, Dr. Schreiber created a world-class cardiovascular program and revolutionized the speed and standard of care for the treatment of heart attacks.

34.     Since 2008, the DMC, through CTO, has greatly reduced mortality rates for emergency heart attack angioplasties and cut door-to-balloon time from more than 90 minutes to about 45 minutes; the Country's best door-to-balloon time.

35.     During this same time that he created and implemented CTO, Dr. Schreiber, working with DMC executives, began the process of developing and then constructing the DMC "Heart Hospital."

36.     The location of the Heart Hospital was strategic.  It is in the center of Detroit, where there are extremely high rates of heart disease, heart failure and high blood pressure.

37.     The DMC Heart Hospital features the full range of heart specialists: cardiologists, cardiac surgeons, vascular surgeons, pediatric cardiovascular surgeons and a nursing team that is cross-trained for any emergency or elective procedure.

38.     In July 2014, the $78 Million Dollar Heart Hospital opened its doors.

39.     The Heart Hospital's dedication took place in August 2014.

40.     A new 15 foot sculpture called "The Tree of Life" by noted Detroit artists and brothers Israel and Erik Nordin, was installed in the Heart Hospital's lobby and noted to be "a symbol of the hospital's mission to embrace and lift the community we serve through the most expert cardiovascular care."

41.     The Nordin brothers have publically stated that the ultimate form the sculpture took was inspired by many discussions they had with Dr. Schreiber. Indeed, the Tree of Life was dedicated to Dr. Schreiber by then DMC CEO Joseph Mullany.  The art installation includes a plaque bearing Dr. Schreiber's name and inscription with one of his guiding principles: "Let's not accept things as they are, but change them to how they should be."

## FOR PROFIT TENET BUYS DMC AND CHANGES ITS FOCUS TO MAXIMIZATION OF PROFIT AT THE EXPENSE OF PATIENT CARE

42.     While the Heart Hospital was being conceived and built, DMC was sold to VHS, Inc., in 2010.

43.     In 2013, Tenet Healthcare in turn purchased VHS, Inc. and, owned DMC when the Heart Hospital opened its doors in July 2014.

44.     Defendants Tenet and DMC receive a significant amount of money from state and federal Medicare and Medicaid funds.  Those funds are regulated pursuant to state and federal law.  Medicare and Medicaid fraud is a crime.

45.     Unfortunately, following Tenet's acquisition of VHS, Inc., the focus at the DMC became boosting revenue and profits at the expense of patient care as

demonstrated by Tenet's aggressive financially motivated cuts that were beginning to take shape at DMC.

46.    The financial focus intensified after September 2016 when Tenet entered into a $513 Million Dollar settlement with the Department of Justice in relation to Tenet's violation of the federal False Claims Act and Georgia's False Medicaid Claims Act ("2016 Settlement").

47.    This was one in a long line of Tenet settlements with the Federal Government over allegations of healthcare fraud involving the Centers for Medicare and Medicaid Services ("CMS").

48.    Indeed, Tenet's history is replete with violating the law and lying to the government in order to enrich the company, its owners and the many for-profit hospitals Tenet owns throughout the country.

49.    The 2016 settlement was the result of a *qui tam* lawsuit that alleged that four of Tenet's hospital subsidiaries in the South conspired with pre-natal healthcare clinics in a kickback scheme that paid the clinic for referring its Medicaid eligible patients to Tenet hospitals.

50.    In addition to the financial settlement, Tenet and all of its hospitals were placed under a three year corporate integrity agreement under which Tenet must self-report all compliance issues to the Department of Justice.

51.     Senior management, including these Defendants, failed to do so and blatantly allowed legal violations to occur in order to generate more income by cutting medically necessary support and allowing unnecessary medical procedures, among other things.

52.     Throughout the course of his employment, Dr. Schreiber reported multiple, significant violations of the law at Defendant hospitals to Defendants Tedeschi, Steiner, and  Evans which included, but were not limited to, suspected health care false claims and fraud that involved improperly claiming Medicare and Medicaid monies. Dr. Schreiber refused to acquiesce in these violations. This reporting and failure to acquiesce reached a head in 2018, leading to Dr. Schreiber's termination.

53.     After Tenet's acquisition of the DMC, Tenet made significant financially motivated cuts at the DMC.

54.     The aggressive cuts included a significant reduction in staff, including the absence of sufficient skilled nurses in the Cath Lab and intensive care units, which compromised the quality of patient care.

55.     Quality of care also declined, in part, due to a higher nurse-to-patient ratio and reduction of personnel to support cardiovascular medicine and cardiac surgery at Harper-Hutzel and Detroit Receiving.  Further, technicians and nurses

were required to multi-task (besides caring for patients, they also were required to answer telephones and transport patients and other clerk tasks).

56.    Due to these aggressive cuts and declining quality of care, Dr. Schreiber began receiving numerous complaints from his patients regarding the woefully deficient care they received from the staff while at Harper-Hutzel Hospital and overall negative customer service experience.  Dr. Schreiber received similar complaints from other physicians at the Heart Hospital who came to Dr. Schreiber as the Heart Hospital's President and Specialist-in-Chief.

57.    Dr. Schreiber repeatedly brought these complaints to Defendants, including Defendant Tedeschi and Defendant Steiner; however, his complaints were ignored.  Defendants' focus was on profitability.  Addressing and fixing the issues giving rise to the complaints raised by these patients and physicians would require a financial investment by Defendants to improve the quality of service provided.

58.    In the spring of 2018, Tenet executives, without advance notice to or consultation with the medical leadership, removed the life-saving Stat Blood Lab from the Cardiac Catherization Unit (CCU) as a cost-cutting measure. This created an immediate and serious patient safety issue, as time is of the essence in receiving blood work results for cardiac patients.  In fact, one patient died because his high potassium levels were not reported to the cardiac team for hours.

59.     Dr. Shreiber, along with non-parties Amir Kaki, M.D. and Mahir Elder, M.D., met with Defendants Tedeschi and Steiner, among others, to insist that the Stat Blood Lab be returned to the CCU.   Subsequently, Steiner acknowledged that these physicians had raised the removal of the Lab as a patient safety concern, including the resulting death of a patient, and stated that the lab would be moved back to the CCU immediately.

60.     In addition, the profitability of physicians was being weighed more heavily by DMC and Tenet executives than the physicians' ability to provide services to patients within the standard of care.

61.     This policy resulted in an increase in unnecessary and/or risky procedures conducted by some physicians leading to bad patient outcomes and even patient deaths.

62.     Dr. Schreiber raised these patient safety issues with regard to unnecessary and sometimes dangerous cardiac medical procedures being performed by other physicians at the DMC. However, Defendants' focus was on profitability provided by the unnecessary medical procedures which generated significant income for the DMC, paid largely by Medicaid and Medicare.   The medical basis for the procedures and the competency of the physicians performing them were simply of less importance to Defendants than the generation of revenue.

63.     Defendant Tenet has clearly indicated that its sole objective is to make a profit. For example, Tenet's CEO Ron Rittenmeyer publically stated:

> "We're in the business to make a profit – number 1 . . . That's our job, so we're always going to be looking to reduce costs.  That's just the facts."

### DR. SCHREIBER REPORTS CARE ISSUES TO DMC AND TENET EXECUTIVES BUT IS IGNORED

64.     Dr. Schreiber brought concerns about physician competency and unnecessary and/or dangerous procedures to DMC peer review meetings in order to ensure that the procedures, some of which resulted in deaths, be investigated. Neither the physicians whose procedures were being questioned nor any of the Defendants welcomed the peer review sought by Dr. Schreiber; to the contrary, Dr. Schreiber's demands for accountability led to complaints about him from the physicians at issue which were backed by senior management at DMC due to their generation of revenue, and led eventually to Dr. Schreiber's wrongful termination.

65.     Although Dr. Schreiber brought the issue of unnecessary or risky procedures to the attention of DMC and Tenet executives, they continued to submit claims to the Federal Government for reimbursement in violation of the fraud and abuse laws.

66.     Dr. Schreiber repeatedly brought his concerns over the significant number of patient and physician complaints regarding deficient quality of care and

overall negative customer service to the attention of DMC and Tenet executives but his concerns were ignored.

67.    Instead, as a result of Dr. Schreiber's continued efforts to alert DMC and Tenet executives that these complaints were serious and had to be addressed, Defendants responded by systematically intimidating, harassing, retaliating against and, eventually extorting Dr. Schreiber.

68.    The focus of profitability over patient care also directly impacted CTO.

69.    Dr. Schreiber raised concerns over physicians who were not qualified to be a part of the CTO team because they did not have the skill or the requisite expertise to perform the procedures on CTO patients and to continue covering CTO calls.  Notwithstanding these concerns, Dr. Schreiber was forbidden by senior Tenet executives from removing these physicians from the CTO list and was instructed to continue to assign these physicians CTO call shifts.  Defendants continued to allow these physicians to work CTO call because of their profitability.

70.    In addition, physicians who were being paid for CTO restricted call were not complying with the requirement that they stay on-site during CTO call at Sinai-Grace Hospital.

71.    Participating cardiologists were required to provide "Restricted On-Call Coverage" between 7:00 p.m. and 7:00 a.m. by being "present in the

emergency department or on an inpatient unit within minutes from being called to evaluate and treat patients with ST elevation myocardial infarction…and other cardiac conditions."

72.     Certain cardiologists assigned to restricted on-call coverage were being paid but were not in the emergency department or on a hospital unit; they were not even on the premises, thus negating the emergent, life-saving purpose of the restricted on-call coverage.   Dr. Schreiber raised these concerns with Defendants beginning in 2015 until he was terminated.

73.     Dr. Schreiber repeatedly voiced his concerns over the CTO issues to Defendants, but they were ignored.

74.     Dr. Schreiber consistently asserted his concerns over the staff cuts and quality of patient care verses profitability to DMC and Tenet executives, but these concerns were also ignored as serious quality issues by DMC and Tenet executives.

75.     Although required to do so, upon information and belief, DMC and Tenet failed to inform the Department of Justice of the compliance issues repeatedly raised by Dr. Schreiber from 2016-2018.

76.     DMC and Tenet executives failed to take action against several substandard cardiologists as they were financially profitable for the DMC and Tenet.

77.     Undeterred, Dr. Schreiber continued asserting his concerns to DMC and Tenet executives throughout 2017 and into 2018.

## DEFENDANTS RETALIATE

78.     As a result of Dr. Schreiber's repeated assertions, he was retaliated against.

79.     At the end of 2017, Dr. Schreiber was stripped of his title as President and Specialist-in-Chief of DMC Heart Hospital and, instead, was demoted to the positions of Executive Director of the Cardiology Service Line and as Program Director of the Interventional Cardiology Fellowship.

80.     In his new position as Executive Director of the Cardiology Service Line, Dr. Schreiber no longer had the authority over the running of the Heart Hospital.  Among other duties he previously held, he was totally removed from significant input into budgetary issues and medical administration as a whole.

81.     In November 2017, Dr. Schreiber and Defendant entered into a Contract to employ Dr. Schreiber as the Executive Director of the Cardiology Service Line. The contract was for the term of five (5) years.

82.     In November 2017, Dr. Schreiber and Defendant entered into a Contract to employ Dr. Schreiber as the Program Director. The contract was for the term of five (5) years.

83.     Notwithstanding the demotions in his titles and employment positions, Dr. Schreiber continued to be hailed by Defendants Tedeschi and Evans as "exceptional in providing outstanding clinical care to Heart Hospital patients." They also acknowledged his role in leading the DMC Cardiovascular Service Line and building the Heart Hospital as a center of innovation and providing outstanding patient outcomes.

84.     However, Defendants' retaliation against Dr. Schreiber for his complaints continued through 2018, including failing and refusing to pay Dr. Schreiber for the CTO call he provided every Monday.

85.     On May 2, 2018, Becker's Hospital Review released its 2018 list of "100 great hospitals in America."

86.     DMC's Harper University Hospital was the only Tenet Hospital on the list.

87.     On May 2, 2018, Defendant Tedeschi emailed the Becker's list to Dr. Schreiber and Defendant Steiner stating, "It is so nice to see Harper-Hutzel Heart Hospital recognized by Becker's as a Top 100 Hospital in the U.S. I am very proud of the recognition and the great care provided to our patients and community. Please share my appreciation with your teams."

88.     Less than two weeks later, individuals at Harper-Hutzel Hospital were instructed by Tenet and DMC executives to produce "all Harper-Hutzel Cardiology

quality & peer review documents from May 1, 2015 to present" to "external counsel" at the law firm Latham & Watkins.

89.    Upon learning of the transfer of this highly confidential documentation to external counsel, Dr. Schreiber voiced his objections to DMC and Tenet Chief Compliance Officer about this process as compromising the integrity of the peer review process.

90.    Dr. Schreiber further voiced his objections in a telephone call with DMC and Tenet executives; specifically, Dr. Schreiber indicated that sharing this documentation with external counsel would violate the sanctity of the peer review process which, in turn, would negatively impact patient care.

91.    Subsequent to this call, Defendant Tedeschi informed Dr. Schreiber that the Defendant DMC and Tenet executives were extremely upset over his comments.

92.    Thereafter, in approximately August 2018, the law firm of Latham & Watkins presented to the Heart Hospital and began performing interviews with some of the non-physician health care providers.  These interviews lasted over several weeks.

93.    Notwithstanding the fact that Dr. Schreiber was the Executive Director of the Cardiovascular Service Line, it was not until September 2018, that Dr. Schreiber was informed by Defendant Tedeschi that the cardiovascular service

line at the Heart Hospital was being reviewed by "outside counsel."

94.     On September 6, 2018, Defendant Tedeschi sent Dr. Shreiber an email informing him that attorney Abid Qureshi of Latham & Watkins would be back in Detroit the week of September 17th conducting "additional interviews in connection with their comprehensive review of the cardiology service line." Defendant Tedeschi further stated, "I'd like to extend to you the opportunity to meet with the team and share your perspective."

95.     Upon information and belief, most if not all interviews with physicians from the cardiology service line, were conducted in the last few days of the "comprehensive review."

96.     Defendants' real plan was to use this "investigation" to provide a cover for the pre-determined decision to force Dr. Schreiber and others out at DMC.

97.     As part of the so-called investigation, Dr. Schreiber met with Latham & Watkins lawyers, Abid Qureshi and Katie Dunn, on Thursday, September 20, 2018 and Dr. Schreiber once again raised many of the complaints detailed above. The lawyers told Dr. Schreiber that they would be finishing interviews by the weekend and would be finalizing their report shortly thereafter.

98.     Allegedly, this investigation resulted in the preparation and production of a report.

99.     Despite multiple requests, this report has never been provided to Dr. Schreiber.

100.    Counsel for Dr. Schreiber was only advised by Mr. Qureshi that the report raised questions about clinical care which would be brought before the DMC Medical Staff committee.

101.    Dr. Schreiber, through counsel, was threatened that bringing these "issues" before the Medical Staff committee would result in the loss of his staff privileges which would be reportable to the National Practitioners Data Bank.

102.    Defendants' threats and extortion forced Dr. Schreiber to resign from the Medical Staff at the DMC.

103.    Defendants' threats and extortion forced Dr. Schreiber to resign as Executive Director of the Cardiology Service Line.

104.    Upon information and belief, the DMC Medical Staff committee has been told by Dr. Tedeschi that the Medical Staff committee will not be receiving the report as it is administrative in nature and does not contain information that needs to be provided to the Medical Staff committee.

105.    Subsequently, on October 1, 2018, without notice or cause, Dr. Schreiber was terminated as Program Director.

106.    In a letter dated October 1, 2018, Defendant Steiner terminated Dr. Schreiber due to an "investigation" resulting in a "determination" that Dr. Schreiber had failed to comply with the "Tenet Standards of Conduct."

107.    Dr. Schreiber has never been informed as to what the Standards of Conduct were that he allegedly violated, how he allegedly violated these standards, nor was the evidence used to reach these conclusions provided to Dr. Schreiber.

108.    At the time of his termination and for the 14 years he was employed by Defendants, Dr. Schreiber had an impeccable reputation at the DMC and in the medical community, both local and internationally, and had never been charged with any violation of policy or standard of conduct.

109.    After Dr. Schreiber was terminated, the federal Centers for Medicare and Medicaid Services ("CMS") ordered inspections of Defendants Detroit Receiving Hospital and Harper University Hospital.

110.    CMS recently informed DMC hospitals that they are now subject to unannounced inspections by the Michigan Department of Licensing and Regulatory Affairs.

## DEFENDANTS DEFAME DR. SCHREIBER

111.    Later on October 1, Defendants Tedeschi and Steiner emailed more than 5,000 employees to announce DMC had terminated three other cardiologists from their administrative positions. They also announced the resignation of Dr.

22

Schreiber from the staff. Defendants Tedeschi, Steiner and DMC accused the four

of unspecified "violations" of "Standards of Conduct."

112.    Defendants also falsely reported to the media that Dr. Schreiber and

the other three cardiologists were guilty of unspecified "violations" of "Tenet

Standards of Conduct."

113.    Dr. Schreiber responded publically to Defendants false statements,

stating in part:

> "Allegations made by DMC Executives and distributed to all DMC
> employees are an orchestrated attempt to silence me and my
> colleagues from continuing to raise legitimate concerns over safety
> and the quality of care provided to our patients.  I refuse to be
> silenced on issues of quality and safety for my patients and for all
> patients treated at the DMC.
>
> Unfortunately, the current focus of some in health care is on profits
> and stock holder value.   Those of us who raise concerns over
> service, safety and the quality of care provided to our patients are
> bullied in an attempt to keep us quiet.   The unfortunate
> consequence of such efforts is to place into jeopardy the
> outstanding results we have achieved for our patients and to
> adversely affect the health of the citizens of the City of Detroit and
> Southeastern Michigan.  Moreover, it is this focus on profits and
> resulting retaliatory atmosphere which has led to my decision to
> resign from the DMC."

114.    Defendants' statements to the media, to DMC physicians, DMC

employees and the public were designed to place Dr. Schreiber in a false, negative

light and to ruin his reputation as retaliation for his complaints about and refusal to

acquiesce in illegal actions.

115.    Dr. Schreiber, as a nationally recognized leader of a cutting edge cardiology and circulatory support program at the Heart Hospital, has been invited to participate in clinical trials which provide him the opportunity for publication, advancement in his career, growing a significant patient base and the ability to work on improving the outcomes of sick patients.

116.    Due to Defendants' actions, Dr. Schreiber is no longer being offered to participate in these clinical trials.

117.    Because of Dr. Schreiber's complaints about compliance issues and patient safety while employed by Defendants in addition to his statements to the media, Defendants have continued to threaten, harass, extort and retaliate against Dr. Schreiber.

118.    Defendants have accused Dr. Schreiber of being the mastermind behind trying to have the DMC interventional cardiology fellowship program dissolved by allegedly starting a "letter writing campaign" directed to the Accreditation Council for Graduate Medical Education.

119.    Defendants have also falsely accused Dr. Schreiber with making "threatening" comments about the DMC in the medical community including stating that he will "tear the place down."

120.    Defendants have threatened to "take all appropriate actions" against Dr. Schreiber for their false accusations.

121.    All of these actions taken by Defendants are in retaliation for Dr. Schreiber reporting compliance violations and violations of the federal and state laws.

## COUNT I
## VIOLATION OF THE RETALIATION PROVISION OF
## THE FALSE CLAIMS ACT 31 U.S.C. §3730(h)

122.    Dr. Schreiber incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

123.    The retaliation provision of the False Claims Act ("FCA") protects an employee, associated other, and/ or contractor from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. §3730(h)(1).

124.    On  numerous occasions, Dr. Schreiber engaged in lawful acts, as set forth in more detail above, in efforts to stop 1 or more violations of the FCA, including but not limited to, 31 U.S.C. §3729(a)(1)(B), 3729(a)(1)(G), 3729(a)(1)(A) and 3729(a)(1)(C), by all the Defendants and others associated with DMC.

125. Defendants retaliated against Dr. Schreiber because of his protected activity by subjecting him to increased scrutiny, isolation, changed terms and conditions of employment, false accusations of poor performance, intimidating him and threatening then extorting him into resigning.

126.   As a result of Dr. Schreiber's protected activity he was demoted, threatened, harassed, intimidated, investigated, extorted, effectively forced to resign certain positions and privileges, and/or terminated.

127.   Defendants retaliated against Dr. Schreiber by discharging him after being directly notified by Dr. Schreiber of his protected activity and/or receiving notice that Dr. Schreiber had engaged in activity protected under the federal FCA.

128. Defendants retaliated against Dr. Schreiber by discharging him, at least in part, because Dr. Schreiber had engaged in activity protected under the federal FCA.

129. Such conduct was in violation of the federal FCA protection provision, 31 USC §3730(h).

130. As a direct and proximate cause of Defendants' conduct of improperly retaliating, harassing, demoting, intimidating, threatening, extorting, investigating, and terminating Dr. Schreiber, he has suffered damages including but not limited to loss of his job and income, loss of career opportunities, and emotional distress, including but not limited to embarrassment, humiliation and outrage.

131. Relief for violating the federal False Claims Act includes reinstatement of the employee, contractor, or agent with the same level of seniority that person would have had but for the discriminatory conduct, as well as double damages for back pay, interest on back pay, and special damages. Relief also includes reasonable attorneys' fees. *Id.* §3730(h)(1)(b).

### COUNT II
### VIOLATION OF THE MICHIGAN MEDICAID
### FALSE CLAIMS ACT MCL §400.610c

132. Dr. Schreiber incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

133. The Michigan Medicaid False Claims Act ("Michigan Medicaid FCA") is an act "to prohibit fraud in the obtaining of benefits or payments in connection with the medical assistance program; to profit kickbacks or bribes in connection with the program; to prohibit conspiracies in obtaining benefits or payments; …to provide for civil actions to recover money received by reason of fraudulent conduct; …to prohibit retaliation; to provide for certain civil fines; and to prescribe remedies and penalties." Michigan Medicaid False Claim Act 72 of 1977. (Emphasis added).

134. Additionally, "[a]n employer shall not discharge, demote, suspend, threaten, harass, or in any other manner, discriminate against an employee in the terms and conditions of employment because the employee engaged in lawful acts,

including initiating, assisting in, or participating in the furtherance of an action under this act or because the employee cooperates with or assists in an investigation under this act." MCL §400.610c.

135. Dr. Schreiber was an employee of Defendants at the time that he alerted Defendants that its physicians, staff, administrators and employees were engaged in unlawful conduct in violation of state and federal law.

136. Dr. Schreiber took lawful acts in furtherance of an action under the Michigan Medicaid False Claims Act when, on numerous occasions, he reported and objected to Defendants' violation of this Act as set forth above.

137. Defendants retaliated against Dr. Schreiber because of his protected activity by subjecting him to increased scrutiny, isolation, changed terms and conditions of employment, false accusations of poor performance, intimidating him and threatening then extorting him to resign.

138. As a result of Dr. Schreiber's protected activity he was demoted, threatened, harassed, intimidated, extorted, investigated, effectively forced to resign certain positions and privileges, and/or terminated.

139. Defendants retaliated against Dr. Schreiber by discharging him after receiving notice that Dr. Schreiber had engaged in protected activity under the Michigan Medicaid False Claims Act, MCL §400.610c.

140. Defendants retaliated against Dr. Schreiber by discharging him, at least in part, because Dr. Schreiber had engaged in activity protected under the Michigan Medicaid False Claims Act.

141. Such conduct was in violation of the Michigan Medicaid False Claims Act, MCL §400.610c.

142. As a direct and proximate cause of Defendants' conduct of improperly retaliating, harassing, demoting, intimidating, threatening, extorting, investigating, and terminating Dr. Schreiber, he has suffered damages including but not limited to loss of his job and income, loss of career opportunities, and emotional distress, including but not limited to embarrassment, humiliation and outrage.

143. Relief for violating the federal Michigan Medicaid False Claims Act includes reinstatement of the employee with the same level of seniority that person would have had but for the discriminatory conduct, as well as double damages for back pay, interest on back pay, special damages and any other relief to make the Plaintiff whole.  MCL §400.610c.

## COUNT III
## RETALIATION/WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

144. Dr. Schreiber incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

145. Defendants' decision to terminate Dr. Schreiber was in retaliation against Dr. Schreiber because, among other things, (i) Dr. Schreiber began to question and confront Defendants about their wrongful conduct, (ii) Defendants wanted him out of the Hospital given their wrongful conduct described above, (iii) Defendants wanted to further hide and conceal their wrongful conduct, and (iv) Dr. Schreiber refused to be complicit in Defendants wrongful conduct.

146. Defendants' wrongful retaliation was an effort to further their fraud, wrongful conduct, and circumvent legislatively created standards, rules, regulations, and/or laws, and otherwise endanger the public.

147. Defendants' decision to retaliate against Dr. Schreiber is violative and contrary to the Public Policy of the State of Michigan; including but not limited to 31 USC §3730(h),§3730(h)(1)(b) and MCL §400.610c

148. Defendants, through their agents, servants, or employees, violated the public policy of the State of Michigan by retaliating against Dr. Schreiber and terminating him for engaging in the above referenced protected activity.

149. Defendants' actions were intentional, with reckless indifference to Dr. Schreiber's rights and sensibilities.

150. As a direct and proximate result of Defendants' intentional and retaliatory conduct that is contrary to the Public Policy of the State of Michigan,

Dr. Schreiber has suffered damages, including, but not limited to, loss of income,

income opportunities, benefits, costs, attorneys' fees and other damages.

**COUNT IV**
**DEFAMATION**

151. Dr. Schreiber incorporates and restates the allegations of the previous

paragraphs of this Complaint as if fully set forth herein.

152. Defendants published remarks to third parties with knowledge of the

falsity of the statements or in reckless disregard of their truth or falsity, including,

for example:

a. An email from Defendant Steiner to the Board Members for
   Detroit Receiving, Harper University, and Hutzel Women's
   Hospital indicating that: "DMC received Dr. Ted Schreiber's
   resignation from the medical staff and from his leadership
   positions in the cardiovascular service line last week during its
   investigation of complaints that he violated our Standards of
   Conduct." The email also "attached a set of talking points you may
   use should you receive questions from your personal contacts."

b. An email from Defendant Steiner to "Physician Colleagues"
   indicating that: "DMC received Dr. Ted Schreiber's resignation
   from the medical staff and from his leadership positions in the
   cardiovascular service line last week during its investigation of
   complaints that he violated our Standards of Conduct."

c. An email sent to over 5,000 DMC employees and physicians
   indicating that: "we are disappointed to see inaccurate and
   misleading claims and statements about the DMC in the press.
   Many of these refer to matters addressed several years ago
   predating today's DMC leadership, and others can be attributed to
   disgruntled physicians whose contracts were recently terminated.
   As we announced last week, the termination of those contracts was
   the result of a thorough review led by outside counsel into

31

complaints from other physicians and team members. The review found that our Standards of Conduct had been violated, and DMC leadership took appropriate action. Any suggestion that these actions were made for reasons other than violations of our Standards of Conduct are false."

d. DMC issued a statement to Crain's Detroit to be published in an article dated October 7, 2018 regarding the termination of several physicians in the cardiology department, including: "A DMC spokesman has denied that the cardiologists were demoted for any other reason than a failure to maintain Tenet's standards of conduct", "Any suggestion that these leadership transitions were made for reasons other than violations of our standards of conduct is false," a statement from DMC said. "The leadership transition is the result of a thorough review led by outside counsel into complaints from other physicians and team members."

e. Tenet also issued a statement to be included in the Crain's Detroit article and indicated that: "This is a decision we did not take lightly and made after informing the Department of Justice of the physicians' conduct."

153. The publications were not privileged.

154. Defendants' accusations were defamation per se.

155. As a direct and proximate cause of Defendants' publication of these remarks, Dr. Schreiber has suffered damages including but not limited to damage to his reputation, loss of his job and income, loss of career opportunities, and emotional distress, including but not limited to embarrassment, humiliation and outrage.

## COUNT V
## FALSE LIGHT

156. Dr. Schreiber incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

157. Defendants made false public statements to third parties to place Dr. Schreiber in a false/negative light, for example:

a. An email from Defendant Steiner to the Board Members for Detroit Receiving, Harper University, and Hutzel Women's Hospital indicating that: "DMC received Dr. Ted Schreiber's resignation from the medical staff and from his leadership positions in the cardiovascular service line last week during its investigation of complaints that he violated our Standards of Conduct." The email also "attached a set of talking points you may use should you receive questions from your personal contacts."

b. An email from Defendant Steiner to "Physician Colleagues" indicating that: "DMC received Dr. Ted Schreiber's resignation from the medical staff and from his leadership positions in the cardiovascular service line last week during its investigation of complaints that he violated our Standards of Conduct."

c. An email sent to over 5,000 DMC employees and physicians indicating that: "we are disappointed to see inaccurate and misleading claims and statements about the DMC in the press. Many of these refer to matters addressed several years ago predating today's DMC leadership, and others can be attributed to disgruntled physicians whose contracts were recently terminated. As we announced last week, the termination of those contracts was the result of a thorough review led by outside counsel into complaints from other physicians and team members. The review found that our Standards of Conduct had been violated, and DMC leadership took appropriate action. Any suggestion that these actions were made for reasons other than violations of our Standards of Conduct are false."

d. DMC issued a statement to Crain's Detroit to be published in an article dated October 7, 2018 regarding the termination of several physicians in the cardiology department, including: "A DMC spokesman has denied that the cardiologists were demoted for any other reason than a failure to maintain Tenet's standards of conduct", "Any suggestion that these leadership transitions were made for reasons other than violations of our standards of conduct is false," a statement from DMC said. "The leadership transition is the result of a thorough review led by outside counsel into complaints from other physicians and team members."

e. Tenet also issued a statement to be included in the Crain's Detroit article and indicated that: "This is a decision we did not take lightly and made after informing the Department of Justice of the physicians' conduct."

158. Defendants specifically identified Dr. Schreiber by name during a number of the public statements.

159. Defendants had knowledge of or acted in a reckless disregard as to the falsity of the publicized matter and the false/negative light in which Dr. Schreiber was placed.

160. The statements by Defendants were unreasonable, highly offensive, and were done with the intention to harm Dr. Schreiber's reputations and career opportunities.

161. Defendants' public statements were made with actual malice.

162. As a direct and proximate cause of Defendants' false remarks, Dr. Schreiber has suffered damages including but not limited to damage to his

reputation, loss of his job and income, loss of career opportunities, and emotional distress, including but not limited to embarrassment, humiliation and outrage.

## COUNT VI
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP

163. Dr. Schreiber incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

164. At all times set forth above, Defendants had knowledge that Dr. Schreiber had a business relationship with many physicians who would refer patients to him who required the specialty services Dr. Schreiber was qualified to perform ("referring physicians").

165. At all times set forth above, Defendants had knowledge that Dr. Schreiber had a business relationship with the patients that he saw and treated at Defendant DMC.

166. By retaliating against Dr. Schreiber and making defamatory statements, including that Dr. Schreiber violated the Tenet "Standards of Conduct" as more fully set forth above, Defendants intentionally and improperly interfered with the business relationships and expectancies between Dr. Schreiber and his patients and the referring physicians.

167. Defendants, through their agents and employees, implemented a plan to reach out to the referring physicians in an effort to induce or cause a breach or termination of the relationship or expectancy with the referring physicians, these

patients and Dr. Schreiber. Again, Defendants intentionally and improperly interfered with the business relationships and expectancies between Dr. Schreiber and his patients and the referring physicians.

168. By retaliating against Dr. Schreiber and making defamatory statements and the intentional efforts to induce or cause a breach or termination of the relationship or expectancy with the referring physicians, as set forth above, these Defendants intended to, and did, interfere with the contracts and business relationships and expectancies, causing their breach, disruption, or termination.

169. As a direct and proximate result of Defendants' actions, Dr. Schreiber has suffered substantial economic injury, loss of goodwill, harm to its business reputation, loss of esteem and standing in the community, and loss of business opportunities.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

170. Dr. Schreiber incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

171. Defendants' conduct as outlined above was intentional.

172. Defendants' conduct as outlined above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

173. Defendants' conduct as outlined above was for an ulterior motive or purpose.

174. Defendants' conduct resulted in severe and serious emotional distress.

175. As a direct and proximate result of Defendants' conduct, Dr. Schreiber has been damaged, including but not limited to suffering from emotional distress humiliation, mortification, embarrassment, sleeplessness and anxiety.

## COUNT VIII
## VIOLATION OF THE FAIR LABOR
## STANDARDS ACT ("FLSA"), 29 U.S.C. § 201 *et seq.*

176. Dr. Schreiber incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

177. Congress enacted the Fair Labor Standards Act in 1938 to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers. . ." 29 U.S.C. §202. To this end, the FLSA generally requires employers to compensate employees, like Dr. Schreiber, for all of the hours worked, at a rate that is not less than the federal minimum wage rate. 29 U.S.C. §206(a)(1).

178. The FLSA defines employer to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C §203(d).

179. The FLSA defines employee as "any individual employed by an employer." 29 U.S.C §203(e)(1).

180. At all times pertinent hereto, Dr. Schreiber was an employee and Defendants were his employers within the meanings set forth in 29 U.S.C. §201 *et seq.*

181. Employers in Michigan must comply with federal wage and hour laws, specifically the FLSA.

182. The FLSA provides that employers must compensate employees at for all hours worked at a rate not less than the minimum wage for any time the employee is required to work.

183. Any employer who violates Sections 206 or 207 of the FLSA is liable to the affected employees for unpaid wages and liquidated damages. 29 U.S.C. §216(b).  Injunctive relief and attorneys' fees may also be ordered against an employer who violates any provision of the FLSA. 29 U.S.C. §§216(b) and 217.

184. Dr. Schreiber performed services by covering CTO call every Monday from January 2018 until he was terminated in October 2018.  Dr. Schreiber was entitled to be compensated for these services. To date, he has not been paid for his services.

185.   Despite Dr. Schreiber's repeated requests for his earned wages, Defendants and their employees continue to willfully fail and/or refuse to comply with the FLSA and Dr. Schreiber's demands for the wages to which he is legally entitled.

## COUNT IX
## VIOLATION OF THE BULLARD-PLAWECKI
## <u>EMPLOYEE RIGHT TO KNOW ACT</u>

186.  Dr. Schreiber incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

187.   At all times material hereto, Dr. Schreiber was an employee and Defendant DMC was an employer covered by and within the meaning of the Bullard-Plawecki employee Right to Know Act, MCL §423.501, et seq.

188. The primary purpose of the Bullard-Plawecki employee right to Know Act (hereafter referred to as "the Act") is to establish an employee's right to examine his personnel records, i.e. "the documents that are being kept by the employer concerning that employee.

189. Per the Act, "Employer" means an individual, corporation, partnership, labor organization, unincorporated association, the state, or an agency or a political subdivision of the state, or any other legal, business, or commercial entity which has 4 or more employees and includes an agent of the employer.   MCL §423.501(2(b).

190.  Per the Act, "Personnel record" means a record kept by the employer that identifies the employee to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment,

promotion, transfer, additional compensation, or disciplinary action.   MCL §423.501(2)( c).

191. Defendants' intentional noncompliance with the Act threatens grave and irreparable harm to Dr. Schreiber's reputation, future employment opportunities and his legal rights.

192. Defendants generated and maintained a personnel record on Dr. Schreiber during the course of Dr. Schreiber's employment with Defendants.

193. Defendant's records contain an "internal report" which purports to set forth the reasons for Dr. Schreiber's termination.

194. According to Defendants, the "internal report" consists of an investigation by an outside law firm and the results thereof.

195. On October 1, 2018, Dr. Schreiber requested his personnel records from the DMC via email.

196. On October 16, 2018, Dr. Schreiber, via counsel, requested his personnel record for the second time.

197. Dr. Schreiber has repeatedly requested, but has been denied by Defendants, access to a complete copy of his personnel record.

198. Defendants have willfully failed and refused to comply with the Act and provide Dr. Schreiber a copy of his personnel record, including the "internal report."

199. Specifically, Defendant, while refusing to provide Dr. Schreiber with a copy of the "internal report" or his personnel records, has casted Dr. Schreiber in a negative light through its statements – those made publicly and to the media – regarding the cause for Dr. Schreiber's termination, including that Defendant relied on an "internal report" for said termination.

200. Defendants' intentional noncompliance with the Act threatens grave and irreparable harm to Dr. Schreiber's reputation, future employment opportunities and his legal rights.

## COUNT X
## CIVIL CONSPIRACY

201. Dr. Schreiber incorporates and restates the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

202. Defendants illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of terminating and defaming Dr. Schreiber based on his complaints about Defendants' violations of laws and various patient safety issues.

203. Defendants, in combination, conspired to terminate and defame/discredit Dr. Schreiber to silence his complaints about Defendants' violations of laws and various patient safety issues.

204. This conspiracy resulted in the illegal, unlawful, or tortious activity of retaliation against Dr. Schreiber in violation of The False Claims Act, Michigan

Medicaid False Claims Act, Retaliation/Wrongful Discharge in Violation of Public Policy, Fair Labor Standards Act, and/or Bullard-Plawecki Employee Right to Known Act, defame/place Dr. Schreiber in a false/negative light, tortuously interfere with business relationships, and/or intentional infliction of emotional distress.

205.   As a direct and proximate cause of the conspiracy and Defendants' illegal, wrongful, or tortious acts, Dr. Schreiber has suffered damages including but not limited to loss of his job and income, loss of career opportunities, and emotional distress, including but not limited to embarrassment, humiliation and outrage.

206. Defendants are jointly and severally liable to Plaintiff for all of his injuries and damages.

## Relief Requested

WHEREFORE, Dr. Schreiber requests a judgment:

1.   Awarding Dr. Schreiber damages in the form of twice the amount of his back pay, interest on such back pay, compensation for all special damages, attorney fees and all other relief to which he is entitled as a result of Defendants' violations of 31 U.S.C. §3730(h) and M.C.L §400.610c;

2.      Awarding Dr. Schreiber compensatory, economic, and noneconomic

damages in whatever amount he is found to be entitled;

3.      Awarding Dr. Schreiber exemplary damages in whatever amount he is

found to be entitled;

4.      Awarding Dr. Schreiber punitive damages in whatever amount he is

found to be entitled;

5.      Awarding Dr. Schreiber liquidated damages in whatever amount he is

found to be entitled;

6.      Awarding Dr. Schreiber interest, costs and reasonable attorney fees;

7.      Awarding Dr. Schreiber equitable relief by entering an injunction

against Defendants prohibiting any further acts of wrongdoing.


OTTENWESS, TAWEEL & SCHENK, PLC

/s/David M. Ottenwess
DAVID M. OTTENWESS (P38820)
STEPHANIE P. OTTENWESS (P51426)
SARAH E. CHERRY (P78311)
Attorneys for Plaintiff
535 Griswold Street, Suite 850
Detroit, MI  48226
(313) 965-2121

Dated:  April 1, 2019

## <u>DEMAND FOR TRIAL BY JURY</u>

NOW COMES Plaintiff, THEODORE SCHREIBER, M.D., by and through his counsel, OTTENWESS, TAWEEL & SCHENK, PLC, and does hereby demand a trial by jury in the above entitled cause of action.

`                               OTTENWESS, TAWEEL & SCHENK, PLC

<u>/s/David M. Ottenwess</u>
DAVID M. OTTENWESS (P38820)
STEPHANIE P. OTTENWESS (P51426)
SARAH E. CHERRY (P78311)
Attorneys for Plaintiff
535 Griswold Street, Suite 850
Detroit, MI  48226
(313) 965-2121

Dated:  April 1, 2019