UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DR. THEODORE SCHREIBER, M.D.,

        Plaintiff,

v.

TENET HEALTHCARE CORPORATION,
ET AL.,

        Defendants.

_____/

Case No. 19-10965

SENIOR U.S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
STEPHANIE DAWKINS DAVIS

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS AND COMPEL ARBITRATION [15]**

Plaintiff, a cardiologist formerly employed by Detroit Medical Center, alleges that Defendants engaged in retaliation within the meaning of the federal False Claims Act ("FCA") when they took adverse employment actions against him. He also alleges that he was misclassified as an independent contractor when he should have been paid as an employee, in violation of the federal Fair Labor Standards Act ("FLSA"). He further pleads several state law causes of action, including violations of the Michigan Medicaid False Claims Act, retaliatory discharge in violation of Michigan public policy, retaliatory removal of clinical privileges in violation of Michigan public policy, false light defamation, violation of the Bullard-Plawecki Employee Right to Know Act, tortious interference with contractual expectations, intentional infliction of emotional distress, and civil conspiracy.

Defendants argue that these claims are all subject to arbitration provisions that Dr. Schreiber agreed to in his personal corporation's contract with Defendant VHS Harper Hutzel Hospital, Inc. ("VHS") on November 8, 2017 and December 11, 2017. The Court will grant this motion in part and compel arbitration on the two causes of action arising under federal law, Count I and VIII, but it will decline to exercise supplemental jurisdiction over the remaining state law causes of action.[1]

## FACTUAL BACKGROUND

Dr. Schreiber is a "world-renowned interventional cardiologist" who was recruited and hired by the Detroit Medical Center ("DMC") in 2004. (Compl. ¶¶ 13-15). He was employed as the President of the DMC Cardiovascular Institute and Specialist-in-Chief of Cardiovascular Medicine at the DMC. (*Id.* at ¶ 16). Dr. Schreiber also founded Cardio Team One ("CTO"). CTO began operating in 2008 with Dr. Schreiber as Director, and it entailed the 24/7 presence of a medical team available to perform emergency balloon angioplasty and stenting. (*Id.* at ¶¶ 23-32).

In 2009, Dr. Schreiber signed a Physician Employment Agreement as the President of the DMC Cardiovascular Institute. That agreement was to be effective on June 1, 2009 and terminate on April 30, 2014. (Dkt. 26-1, Pl. Ex. L). Dr. Schreiber also signed a Physician Independent Contractor Agreement with DMC to be effective from

---

[1] Also before the Court is a companion case brought by Dr. Amir Kaki and Dr. Mahir Elder, both colleagues of Plaintiff in similar, but by no means identical, situations. *See Amir Kaki, M.D., et al. v. Tenet Healthcare Corporation, et al.*, Case No. 2:19-cv-10863-AJT-DRG. That case has also been dismissed without prejudice.

May 1, 2010 to April 30, 2012. (Dkt. 26-1, Pl. Ex. M). DMC was sold to VHS in 2010. (Compl. at ¶ 42). In 2011, VHS signed two Physician Independent Contract agreements with Dr. Schreiber, one to be effective from December 1, 2011 to November 30, 2012, and the other to be effective from July 28, 2011 to December 31, 2013. (Dkt. 26-1, Pl. Ex. J & K). VHS was sold to Tenet Healthcare Corporation ("Tenet") in 2013. (Compl. at ¶ 43). In 2014, DMC opened its Heart Hospital, which was developed with Dr. Schreiber's assistance. (*Id.* at ¶¶ 35-38).

The Complaint alleges that from the beginning Tenet sacrificed patient care for profit-making. Plaintiff observes that after the takeover Tenet made significant budgetary cuts to DMC, including depriving the Cath lab and intensive care unit of sufficient personnel. (*Id.* at ¶¶ 54-55). Plaintiff further alleges that doctors came to him to voice their concerns that these aggressive cuts were diminishing standards of care. Dr. Schreiber, along with Dr. Kaki and Dr. Elder, brought these complaints to the attention of hospital executives, including Defendants Tedeschi and Steiner. (*Id.* at ¶¶ 56-59). He also alleges that Tenet was foisting unnecessary and dangerous medical procedures on patients to increase Medicare and Medicaid income, in addition to other misconduct. (*Id.* at ¶ 62).

At the end of 2017, allegedly due to his outspoken complaints to hospital administrators, Dr. Schreiber was stripped of his positions as President and Specialist-in-Chief and was demoted to the positions of Executive Director of the Cardiology Service Line and Program Director of the Interventional Cardiology Fellowship. (*Id.* at

¶ 79). His new positions entailed substantially less authority over budget allocation and the administration of the Heart Hospital. (*Id.* at ¶ 80). The contracts for these positions contained the arbitration provisions that are the subject of Defendants' motion.

In May of 2018, Tenet and DMC executives instructed various of their staff to produce "all Harper-Hutzel Cardiology quality & peer review documents from May 1, 2015 to present" for review by outside counsel from the law firm Latham & Watkins. (*Id.* at ¶ 88). Dr. Schreiber objected to this process as violative of the sanctity of the peer review process and thereby dangerous, and Defendant Tedeschi informed Dr. Schreiber that DMC and Tenet executives were very upset with his objections. (*Id.* at ¶¶ 89-91). Latham & Watkins began their review in August of 2018. (*Id.* at ¶ 92). Dr. Schreiber met with Latham & Watkins attorneys for an interview on September 20, 2018. (*Id.* at ¶ 97). The interviews led to the production of a report, which, at the time of the complaint, had not been provided to Dr. Schreiber. (*Id.* at ¶¶ 98-99).

In an October 1, 2018 letter, Defendant Steiner informed Dr. Schreiber that he was terminated from his leadership positions due to an investigation that resulted in a determination that he had violated Tenet Standards of Conduct. (*Id.* at ¶ 106). That same day, Defendants emailed more than 5,000 hospital employees that Dr. Schreiber, along with several other cardiologists, had been terminated for unspecified violations of the Tenet Standards of Conduct. (*Id.* at ¶ 111). Defendants' conduct also forced him to resign from the medical staff at the DMC. (*Id.* at ¶ 102).

## PROCEDURAL HISTORY

Plaintiff filed his complaint on April 1, 2019. [Dkt. # 1]. On May 7, 2019 Defendants filed a Motion to Dismiss and Compel Arbitration [15]. That motion was set for a hearing on July 25, 2019 [22], but, following a status conference on July 17, 2019, the Court adjourned the hearing to give the parties time to conduct limited discovery into whether or not there were other contracts between Defendants and Plaintiff. Plaintiff filed his supplemental brief [26] on September 12, 2019. Defendants filed their Response [27] on September 26, 2019. The Court held a hearing on Defendants' motion on October 3, 2019.

## LEGAL STANDARD

Under the Federal Arbitration Act, 9 U.S.C. § 2, ("FAA"), a written agreement to arbitrate disputes which arises out of a contract involving transactions in interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). "[A]ny doubts regarding arbitrability should be resolved in favor of arbitration." *Fazio v. Lehman Bros.*, 340 F.3d 386, 392 (6th Cir. 2003) (internal citation omitted). "Despite this strong presumption in favor of arbitration, "arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 813 (6th Cir. 2008) (quoting *Simon v. Pfizer Inc.,* 398 F.3d 765, 775 (6th Cir.2005)).

## ANALYSIS

Plaintiff alleges the following causes of action.

Count I: Violation of the Retaliation Provision of the False Claims Act
Count II: Violation of the Michigan Medicaid False Claims Act
Count III: Retaliation in Violation of Public Policy
Count IV: Defamation
Count V: False Light
Count VI: Tortious Interference with Business Relationship
Count VII: Intentional Infliction of Emotional Distress
Count VIII: Violation of the Fair Labor Standards Act
Count IX: Violation of the Bullard-Plawecki Right to Know Act
Count X: Civil Conspiracy

The Program Director Agreement and the Executive Director Agreement both contained the following language:

> Any dispute or controversy arising under, out of, or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof, shall be determined and settled by final and binding arbitration in the county in which the Hospital is located in accordance with the Commercial Rules of Arbitration ("Rules") of the Judicial Arbitration and Mediation Services ("JAMS") before one arbitrator applying the laws of the State.

(Dkt. 15-3, Ex. B pg. 7; Dkt. 15-4, Ex. C pg. 7).

When confronted with arbitration provisions that encompass disputes "relating to" the contract, the Sixth Circuit has held that any dispute that "must make reference to" the contract is subject to mandatory arbitration. *Fazio*, 340 F.3d at 396; *see also NCR Corp.*, 512 F.3d at 814 ("the cornerstone of our inquiry rests upon whether we can resolve the instant case without reference to the agreement containing the arbitration clause."). This is only one stage of the inquiry, however.

When considering a motion to stay proceedings and compel arbitration under the Act, a court has four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the action are subject to arbitration, it must determine whether to stay the remainder of the proceedings pending arbitration.

*Glazer v. Lehman Bros.*, 394 F.3d 444, 451 (6th Cir. 2005) (quoting *Stout*, 228 F.3d at 714).

The first prong is undisputed. The parties agreed to arbitrate at least matters arising from or relating to the 2017 directorship agreements. The scope of these agreements is disputed, however, as is whether Congress intended Plaintiff's FLSA claim to be nonarbitrable.

**<u>Scope</u>**

The operative question is whether the disputes raised in the complaint arise "under, out of, or in connection with, or in relation to" the two Directorship Agreements. As per *NCR Corp* and *Fazio*, this inquiry requires the Court to ask if the present disputes can be resolved without referencing the content of the agreements containing the arbitration clauses. At least the FCA and FLSA disputes cannot.

Plaintiff's FCA retaliation claim incorporates allegations that Dr. Schreiber was demoted from his positions as the President and Specialist-in-Chief of DMC Heart Hospital to the directorship positions outlined in the 2017 agreements. (Compl. ¶¶ 79-80). It hinges on allegations that Defendants were retaliating against Dr. Schreiber when, the following year, they forced him to resign as Executive Director of the

Cardiology Service Line and terminated him as Program Director. (*Id*. at ¶¶ 103, 105). Plaintiff contends that Defendants' stated reasons for disciplining Dr. Schreiber — alleged violations of Tenets Standards of Conduct as referenced in the directorship agreements — were thin pretexts. (Id. at ¶ 96). The factual narrative underlying the FCA claim therefore directly relates to the 2017 directorship agreements, which contain the arbitration clauses. Though Plaintiff is no doubt correct that his fourteen-year relationship with DMC was vastly more expansive and complicated than the duties and responsibilities outlined in these two agreements, the retaliation at the heart of his FCA claim arises directly from the creation and termination of these agreements. Count I therefore falls within the scope of the parties' agreement to arbitrate.

Plaintiff's FLSA claim is also within the scope of the 2017 directorship agreements. Plaintiff relies on *U.S. ex rel. Paige v. BAE Systems*, 566 Fed. App'x 500 (6th Cir. 2014). The Sixth Circuit in that case determined that an employment agreement mandating arbitration for disputes "arising from" the agreement did not mandate the arbitration of employees' *qui tam* action alleging fraud under the FCA. *Id*. Critically though, that case distinguished *NCR Corps* on the grounds that the arbitration clause signed by the relators in *BAE Systems* "explicitly limits the scope of the clause to the disputes arising 'under the terms of this agreement' and does not include claims 'related' to the agreement or that arise out of the relationship between the parties." *Id*. at 504. The arbitration clause was therefore "narrower than those cases addressing broadly-worded arbitration clauses." *Id*.

The arbitration clauses in this case do use the terms "in relation to." This term, in 2017, had the established legal effect of creating a broad arbitration agreement. It therefore provided Plaintiff with "clear notice" of an agreement to arbitrate disputes whose resolution would require referencing the agreements. *Rembert v. Ryan's Family Steak Houses, Inc*. 596 N.W.2d 208, 228 (Mich. Ct. App. 1999).

Plaintiff also argues that he had an independent employment relationship with Defendants that was explicitly disclaimed by his Directorship Agreement, which specified that Dr. Schreiber's medical group was an independent contractor. In order to even undertake the Michigan economic realities test to determine if Plaintiff was misclassified as an independent contractor, however, a court would need to evaluate Plaintiff's job responsibilities, both in practice and as outlined in the directorship agreements. The directorship agreements provide detailed lists of Dr. Schreiber's duties, compensation, and responsibilities. (Dkt. 15-3, Ex. A; Dkt. 15-4, Ex. A).

Even after limited discovery, Plaintiff was not able to present any employment contract in effect at the time of his alleged demotion and termination. (*See* Dkt. 26-1). The directorship agreements would therefore provide the only contractual evidence of Dr. Schreiber's relationship with Defendants, and references to it would be inevitable in adjudicating a FLSA misclassification case. More to the point, by arguing that he was forced into the directorship agreements (while stopping short of alleging duress), and that those agreements misrepresented his relationship to his employer, Dr. Schreiber is directly attacking the validity of the directorship agreements. Such an

argument certainly arises "under, out of, or in connection with, or in relation to" the agreements. Count VIII therefore falls within the scope of the parties' agreement to arbitrate.

## Arbitrability

The Supreme Court has "recognized that federal statutory claims can be appropriately resolved through arbitration, and [it has] enforced agreements to arbitrate that involve such claims." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 89 (2000). "[E]ven claims arising under a statute designed to further important social policies may be arbitrated "so long as the prospective litigant effectively may vindicate [his or her] statutory cause of action in the arbitral forum." *Id.* at 90 (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)).

Plaintiff argues that his FLSA claims are nonarbitrable because the FLSA requires the award of attorney fees to a prevailing plaintiff, while JAMS arbitration rules specify that costs be split. JAMS Rule 4, however, specifies that where such rules conflict with the applicable law, the provision of law controls. (Dkt. 19-5, Ex. K). Plaintiff's rights to attorney fees under FLSA can thus be vindicated in arbitration. *See Wilks v. Pep Boys*, 241 F.Supp.2d 860, 866-67 (M.D. Tenn. 2003) (holding that similar JAMS and AAA rules meant that an arbitrator would be required to award attorney fees to a prevailing FLSA plaintiff).

Plaintiff furthers argues that the arbitration clauses are contrary to public policy because they allow Defendants to keep evidence of their alleged wrongdoing out of the

public forum. The FAA provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Interpreting the final savings clause of § 2, the Supreme Court has observed that the FAA permits the invalidation of agreements to arbitrate "by generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). Plaintiff's position, that arbitration is against public policy because it is private, is thus foreclosed by the FAA, which itself reflects a "liberal federal policy favoring arbitration." *Id*. (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24 (1983)).

Counts I and VIII, alleging violations of provisions of the False Claims Act and the Fair Labor Standards Act, must therefore be arbitrated.

## **Supplemental Jurisdiction**

The remaining counts all arise from Michigan law. The Court's only basis for jurisdiction over them is supplemental jurisdiction. "A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc*., 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed

all claims over which it has original jurisdiction")). District courts consider the following factors when determining whether to exercise such jurisdiction.

> Under *Gibbs*, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

*See Carnegie-Mellon University v. Cohill*, 484 U.S. 34, 354-356 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)).

The factors in this case clearly militate in favor of dismissal. Discovery has not commenced, and the case is still in its earliest stages. Principles of comity suggest that Michigan courts should adjudicate cases arising entirely from Michigan statutory and common law. The Court will dismiss Counts II, III, IV, V, VI, VII, IX and X without prejudice so that state courts can determine the arbitrability of the state law causes of action.

## CONCLUSION

Dr. Schreiber is a skilled cardiologist and a seasoned hospital administrator with access to counsel who agreed to arbitrate all disputes "arising under, out of, or in connection with, or in relation to" the two 2017 directorship agreements. The FAA provides that such agreements shall be enforceable, and Plaintiff's collateral attacks on the agreements are unavailing. The Court will therefore compel arbitration on the two

federal claims that form the basis of its jurisdiction, Counts I and VIII, and dismiss the remaining claims so that they can be adjudicated by Michigan courts.

Accordingly,

**IT IS ORDERED** that Defendants' Motion to Dismiss and Compel Arbitration [15] is **GRANTED**. The case is dismissed without prejudice.

**SO ORDERED**.


<u>s/Arthur J. Tarnow</u>
Arthur J. Tarnow
Dated: October 9, 2019                    Senior United States District Judge